The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated. Welcome to the Fourth Circuit this morning. And Judge Agee and Judge Heitens and I look forward to the arguments in these three interesting cases. And the first one is Sederra Partners v. Blue Cross of North Carolina. Mr. Pearson. Yes, Your Honor. Good to have you with us, sir. Thank you, Your Honor. And you can remove your mask if you would like. Thank you very much, Your Honor. I honestly would prefer you do because I can understand things better. But it's up to you all. But you go ahead. You may proceed. Thank you, Your Honor. May it please the Court, Adam Pearson, appearing on behalf of Appellant Senderra RX Partners, LLC. Your Honor, the District Court erred in granting summary judgment because there are still multiple issues of fact to be resolved in this case. Senderra presented sufficient evidence below that despite North Carolina's pharmacy of choice statute, Blue Cross of North Carolina, in fact, developed a plan to exclude multiple pharmacies from the opportunity to participate in their specialty pharmacy network, implemented that plan by requiring impossible requirements, and then selectively communicating those requirements to only certain pharmacies. And then finally, when it became necessary for certain preferred pharmacies to remain in the network, Blue Cross simply, at its discretion, excused those pharmacies from certain requirements that it needed. So how long was your client excluded? Your Honor, we were excluded for a period of October 15th to July 1st, so about eight months, I believe. Eight and a half months? Yes, Your Honor. That wasn't much of a plan of exclusion, it would seem like. Well, Your Honor, the reason that we were promptly able to get back in is because we acted as quickly as possible. There are multiple instances in the record where it shows the process. If I can back up, the requirement at issue here is the in-state dispensing requirement, and that was announced for the first time in May of 2018. The problem is that if a pharmacy did not already have an in-state pharmacy like my client did not, it was a process of multiple months to obtain that, to go through the process of obtaining a pharmacy. Is a pharmacy equivalent to dispensary? Isn't that the term that you used in the briefing? Yes, Your Honor, for purposes of this case. The term dispensary. Correct, Your Honor. I don't know, but that's equivalent to what you're saying, a pharmacy. Yes, Your Honor. I think when it appears in the briefing, that's the sort of term. I understood it, but I just wanted to make sure. Yes, Your Honor. So the reason that Sendera was able to get back in the network as quickly as it could is because it acted very quickly to purchase the land, the building for a pharmacy, hire pharmacists, get the permit credentialing, but even then, it was still only able to rejoin the network after eight months. And I will emphasize the damage. And you say you were defrauded into doing all that. I mean, you got a fraud claim in here. Yes, Your Honor. Then the fact that it was a short-to-short period undermined that fraud claim on its own. No, Your Honor. If they're going to defraud you and kick you out of the plan, it would seem to me like they'd want to keep you out. Yes, Your Honor. The fraud claim is based on multiple omissions and misrepresentations that occurred in 2018. Fraud, this is a strong word, bringing it into a courtroom. Yes, Your Honor. And, again, the reason that the district court granted summary judgment on that claim was because it believed that there were no set of facts that Sendera, my client, could have been confused about the requirement that was needed for an in-state dispensing location. Pearson, can I take a step back? I mean this sincerely. What specific statutory provision do you claim that they violated? Because I understand the parties before the district court didn't necessarily appear to disagree about the legal standard, but I was having the hardest time in the world figuring out where these requirements that you assert come from in the language of the statute. Yes, Your Honor. So the statutes at issue are subsection C1, C2, and C4 read in tandem with subsection C of the statute. So if I were to say what language do you say they violate, you say it's complicated and you've got to read a whole bunch of statutes to deduce this rule? Is that a fair description of what you just said? No, Your Honor. I would say that, in fact, they committed multiple violations that ran across several subsections. Each one were violated in isolation. How many statutory violations are you saying there are? You say they committed multiple violations. Multiple means a few, more than two, I guess. How many and what were they?  Yes, I apologize, Your Honor. When I said multiple violations, what I meant were violations of multiple provisions within the statute that they violated. You said multiple violations, wasn't it? I'm sorry, Your Honor? Multiple violations, if you're saying multiple provisions. You connect with Judge Heitens. I'd like to figure that out, too, what they did. What might be helpful here is if you would identify the particular statute and then tell us specifically what you allege and have proffered proof for was the violation by Brew Cross. Yes, Your Honor, I would be happy to. So if I will, I'll go ahead and jump straight to subsection C-2. I believe subsection C-1 and C-2, there is quite a bit of overlap between the two. But looking at subsection C-2, Brew Cross is prohibited from structuring a plan that would deny a pharmacy the opportunity to participate, and I'm not quoting, I'm paraphrasing, I apologize, the opportunity to participate as a contract provider on the same terms and requirements as are applied to other pharmacies. And that provision, it says that meet the terms and requirements. That has been interpreted by the North Carolina Department of Insurance, which North Carolina courts give great deference to, that says that requires that the plan offer each pharmacy the opportunity to participate under equal terms. And so that violation occurred from Brew Cross. In terms of proffer from the evidence, there are references in the record to, I'll just offer a few, differences in communication. The district court below said that Brew Cross was not required to explain the terms and requirements to us. We believe that was a violation of the statute. What term of the statute does, I mean, maybe as a matter of good business practice they should have, but what in the statute imposes a duty of adequate communication? So, Your Honor, there is, I would say, inherent in allowing us to participate under the requirements, as the district court did find in another part of the opinion, we have to be told what those requirements are. And so they don't have to tell us. Well, or they can't conceal from you the ability to learn the requirements yourself. I'm not sure you can say that to be able to be given an opportunity. I mean, let me describe at a high level of generality. To the extent we're arguing about this need for the permit to have a pharmacy that actually dispenses, it strikes me their best argument is, well, if you needed to know that, you should just go to the North Carolina website, which tells you that. They don't need to tell you something that's available on a publicly available website in North Carolina that you can't dispense drugs unless you have this permit. Yes, Your Honor. So a few responses to that is, number one, subsection C does actually put the onus on the health plan insurer that they announce the terms and requirements of their plan. They have to actually tell them to us. And part of that is telling us specifically what they're requiring. So if they say an in-state dispensing requirement, if that can be met by ways of an affiliate or some other business arrangement, or whether it actually requires that every specialty network has to actually 100% own a pharmacy, that's a requirement that needs to be told to us. But in reference to Your Honor's point about the permit. Am I correct that during the period of time that you needed to meet the qualifications in order to get into one of the entry periods, specific dates you have to complete the requirements by in order to enter? And if you don't, then you are six months or four months later before you can get in. Your client never had an actual dispensary in the initial time period. Is that right? We did not have the in-state dispensing location requirement met by October 15th, as it was ultimately required by Blue Cross. Yes. Yes, Your Honor. So did they let anybody in by that period who did not have an in-state dispensary? Yes, Your Honor, they did. As that requirement is understood, as they've explained it, there were multiple pharmacies, Aveda and Long's, that did not meet that requirement because they had not done the credentialing part of that requirement. That's different than what you started out with because those two pharmacies, if I remember the record, had an actual physical location that could dispense drugs. Isn't that right? Yes, Your Honor. And your client did not? That's correct, Your Honor. The reason being, well, if I may. When you talk there about those two pharmacies, they each had multiple locations? They each had a location within the state of North Carolina. Just one? I'm sorry, Your Honor. I believe that they both each had their own. They each had their own, so there were two. Yes. Neither of them had multiple locations. I actually don't know, Your Honor, if that's in the record, whether they had outside the state locations. But if I may briefly turn to Your Honor's comment, I just want to touch briefly on this implicit understanding that we must have known that a permit had to be required. Again, the provisions that they point to in the announcement of the plan was that a permit was required in other provisions, not necessarily that it was required for the North Carolina location. Sendera has always had a North Carolina permit. A pharmacy with a physical location, or maybe even one that's mail order, can they dispense drugs in North Carolina without a permit? To dispense within North Carolina, you have to have a permit. But that's why Sendera always has had a permit. Again, in the world of specialty pharmacies where— If they always had a permit in the past, why would you think you wouldn't need one here? Well, a few reasons, Your Honor. Number one is because there was no actual dispensing that's required out of North Carolina. Nothing in the plan requires that dispensing actually occur. Number two is because mail order is typically the practice that is undertaken by specialty pharmacies. They differ in normal pharmacies in that these are specialty medications that are almost always fulfilled through mail order. Number three, it's an impossible requirement. As the record demonstrates, Blue Cross itself admits that this requirement of actually physically obtaining a permitted, credentialed, North Carolina location for a pharmacy that did not have it as of May 2018 when it was announced, it was impossible to meet that requirement by the deadline of October 15th. You mentioned something earlier that's also in your brief. You say they had a goal to reduce the number of dispensing pharmacies. Is your claim that that goal is itself inherently impermissible under the statute? And if so, where does the statute impose that requirement? No, Your Honor. It's not our contention that that intent or that goal by itself is a violation of the statute. The reason that becomes a problem is that when ultimately Blue Cross later admits that whether a pharmacy remained or was removed from the network ultimately decided, at least in part, on Blue Cross' discretion. Once Blue Cross admits that it's acting on its discretion, when you're looking at an issue of proximate cause, the question then becomes of what was the cause of Sendera's exclusion. Was it because Sendera failed to understand or failed to properly act, or was it because Blue Cross acted on its discretion and didn't extend the same opportunity to Sendera that it did to other pharmacies? Judge King mentioned your fraud claim, and I had a question about that too that I wanted to ask during your initial argument. For purposes of your fraud claim, what specific statements do you claim were false or misleading? Because, again, I was a little confused reading your briefing. I mean, the first element of fraud is a false or materially misleading statement, and based on your briefing, I'm not sure what claim you're asserting was false or misleading. Yes, Your Honor. So the fraud claim is based on an omission, that the requirement inherently contained these requirements that were not communicated to Sendera, despite multiple requests that were communicated to other pharmacies. There are instances in the record, I believe, on Appendix Site 1216, where Blue Cross admits that when some pharmacies came to them and asked about the requirements, they were told about them. But hold on. I understand an omission can be misleading as a matter of fraud, but it's only if there is a duty to disclose or there's a need to make additional statements to render something else that you said not misleading. They did a better job of telling other people, does not strike me as a material omission for fraud, unless you can show me that there's some preexisting duty to disclose or that something they said created this misleading impression. So I don't think that the fact they might have done a better job communicating to other people gets you there on element one of a fraud claim. Understood, Your Honor. I would push back on that again because there is some tension between the idea of whether or not they told us a requirement that was required under the statute and whether or not it was simply a matter of not explaining the requirement. I'll point out, still to this day, we don't know the full extent of what's required or how a pharmacy might meet the in-state dispensing requirement. Despite the fact that you currently are working in North Carolina? Yes, Your Honor. We know one way to satisfy the requirement, and that is to physically obtain an actual pharmacy within North Carolina, buy it, staff it, permit dispensing, all of that. But there are other ways that pharmacies, not every pharmacy has met it that way. You've heard much in the briefing about the affiliate exception. Blue Cross says that that was a simple matter of contract law. It's not. Blue Cross is not required to accept contracting through affiliates. It's not required to accept any part of contracting. It's simply accepted to do that. And it's said when Sendera has asked multiple times what the standard is for that, how do we decide if that's something that we can do or not, they've told us, well, we can't tell you because it's a case-by-case basis. So even to this day, the ways that this requirement can be met is still unknown. Blue Cross has simply told us one way that we could obtain it and didn't tell us any others, and so that was the route that we had to go. Your Honors, I would just point out again. Let me ask you something. There's no federal questions in this thing anywhere. That's correct, Your Honor, there are not. All state law. Correct, Your Honor. It's never been ruled on by any state court, none of these issues. These specific issues, no, Your Honor. These have not been. And we can't certify issues in North Carolina. You started this thing in federal court. Yes, Your Honor, we did on diversity jurisdiction. But I will say, although these involve novel issues of statutory interpretation, I apologize, my time is out. You go ahead. As long as you get questions, you keep going. Okay, thank you, Your Honor. What's actually at issue here are provisions that this court either is familiar with or has direction from state agencies. Again, the provision of subsection C, at least with respect to C-2, has been interpreted by North Carolina's Department of Insurance. And that is an interpretation that North Carolina courts give great weight to. And also on the issue that was the primary basis of the district court's grant of summary judgment was an issue of proximate cause. Obviously, this court and other courts are familiar with the context of proximate cause. And the question is whether there are sufficient facts in dispute as to whether Sendera was affected at all by Blue Cross's actions that violated the statute. Thank you, Your Honor. Thank you. You saved some time. Mr. Charnas. Good to have you with us, Mr. Charnas. Thank you, Your Honor. Good morning, and may it please the court. I represent Blue Cross of North Carolina in this appeal. And we think that the district court correctly granted summary judgment for multiple reasons. First of all... I thought you said she, but you say that she erred. She committed error right off the bat. That's the first thing in your brief just about. That's true. We think she erred in applying subsection C, that that provision of the statute does not apply at all. But even if it does apply, there's no fact disputes here. And maybe I'll start with the second point, because that seemed to be the focus of the court's questions and discussion that would allow the court to avoid having to construe the statute at all. I mean, the fact of the matter is... Before you jump into that, could we just clarify? You agree that in order to affirm the district court's decision, we don't have to reach your threshold argument about whether subsection C applies at all. That is correct. If you agree there's no fact issues in dispute, you do not have to... You can assume that the district court was correct in applying C. Yeah, thank you. And there really are no fact issues here. All you have to do is look at the network provider agreement, the NPA, the addendum, and the website to which Sundara was referred, and which by the provisions of the contract was incorporated in the contract itself. The website terms on page 689 of the joint appendix are incorporated in the contract, and they disclose everything. They tell Sundara you need a dispensing location in North Carolina. As a matter of law, as the court has alluded to, under North Carolina law you need a permit from the Board of Pharmacy to dispense locations from a location in North Carolina. The NPA itself and the addendum itself state that they need a permit, and the website also states they need a permit for the location in North Carolina. They complain about the... I assume counsel theoretically intended to build a dispensing pharmacy and not have a permit, but then they couldn't dispense any prescriptions. Correct. That's absolutely correct. The URAC requirement they complain about, URAC requirement, that's disclosed explicitly, page 551 of the joint appendix, in the addendum to the contract. It's also discussed on the website. Basically everything that they complain about is either required by North The notion that Sundara acted with dispatch, and that's how they got their dispensing location approved for the next time the cycle was open six or eight months later, I think you need to look at the record about what they did in April and May when they were first told they needed a dispensing requirement, which was a new requirement. What they did was nothing. They didn't try and get a location in North Carolina. They didn't try and get a pharmacy permit. In fact, they didn't manage to get such a location and apply for a permit until just a month or so before the requirement. Instead what they did, almost immediately, within two weeks, what they did was they wrote to all their doctors that use their services in North Carolina and asked them to write a letter protesting Sundara's exclusion from the network. So they basically accepted that they were not going to be able to get a dispensing location in North Carolina. They didn't even try. And instead they hoped to get the ---- But to be fair to them, they say you imposed upon them a task that was impossible and that you should have known was impossible. Well, two dozen other pharmacies managed to do it. Two dozen pharmacies, 24 exactly, were admitted into the new network and managed to get a dispensing location and satisfy all the other requirements. Now, even if it was literally impossible to do and there's no evidence in the record that it is, even if it is, that's not a violation of the statute. There's nothing in the statute requires them to meet our terms and conditions. So we're talking about the merits now. So your brief injected an issue into the case that I think because of the nature of the argument we have to reach, whether we want to or not. You argue that this is an Article III standing problem, and I guess I'll start out by expressing skepticism that this is a standing problem. Do you need us to agree with you that this is a standing problem for us to affirm? No. There's no violation. There's multiple reasons why we think they lose. The district court said that they were not – the statute requires that they be aggrieved by any violation. The district court said they're not aggrieved by a violation because basically there are four, five, six things that are required in order to meet the minimum criteria to be in this network. That's not Article III violations. Isn't that just a question of whether the statute applies? Well, I think it's – we think opposition is that it's both. And you could – then the reason I say that is if there are five things that they're required to do, they failed at step one. Step one is have a Board of Pharmacy permit for a dispensing location in the state. They allege that we – our violations are that we were too kind and gentle to other pharmacies at steps four and five. So they – but they weren't injured by our relaxing the – we disagree that we – but assuming they're right, they allege that we relaxed the statutory – or the requirements of the contract for steps four and five, but they weren't injured by that because they failed to – they failed step one right out of the gate. Right. So that means their claim fails, not that they don't have Article III standing, right? Well, Your Honor, I will accept the victory on that – on that grounds as well. I think that, you know, within the district – the district court phrased it as they weren't aggrieved. They have to be injured by – that's a causation. Article III standing requires causation. And because the – any violation of the statute didn't injure them, we think it's also an Article III problem. But I agree with you, the same exact rationale for why – that we argued for why there's an Article III problem also means that they didn't – they don't have a claim under the statute. So I think the court doesn't – if the court disagrees with us about Article III, it doesn't really matter as long as you agree with us on the factual question that they weren't injured by a violation. And to get to a question that the court asked, there's not a single pharmacy that was let into this network that did not have a permitted dispensing location in North Carolina. That's why they were excluded. No other pharmacy was treated any differently as to that requirement. Now – and that should be the end of the story. The statute requires – There was an acronym, a credentialing acronym. URAC, U-R-A-C. What is that? URAC is sort of a quality control, quality assurance organization, an independent organization that comes in and credentials or approves, certifies the pharmacy as meeting certain minimum quality standards. Essentially, it's a – Sort of like the Joint Commission for Claimers. Exactly. It's not required by law. It's just an additional measure of quality, and that's why Blue Cross requires it. And that's sort of the difference between Aveda and Long's. One of the differences between Aveda and Long's and Sendera, Aveda and Long's is undisputed. I think counsel just admitted it. They had a permitted dispensing location in North Carolina. They were allowed to dispense drugs from their North Carolina location to Blue Cross's members. And that's a requirement that even if we wanted to, we couldn't relax. We can't let a pharmacy dispense drugs in North Carolina without a permit from the Board of Pharmacy. And there's a good reason why North Carolina – Blue Cross of North Carolina imposed this requirement. They wanted members in North Carolina, if they had an emergency, they had to speak to a pharmacist right away. They needed a drug today. Counsel said most of these drugs are mail order, and that's correct. But suppose they need a drug today. You came from the doctor and he said or she said you need this today. Blue Cross wanted members to be able to get in their car and drive to a pharmacy location and present the prescription to get a drug. And that's the – But they only have – I mean, maybe, but they only have to have one in-person dispensing location in the entire state of North Carolina, right? That's true. That is true. And does that one dispensing requirement have to have the full suite of every single drug that this pharmacy sells? No, Your Honor, but – So as a practical matter, you can't actually ensure that someone can get in their car and go and get it in person because it might be six hours away and it might not have the drug that you need that day anyway. Well, there's no 100 percent guarantee that's true, but there are 24 participating pharmacies that have different locations presumably throughout the state, and the point is to have network coverage. And what about these big pharmacies like Walgreen's and CVS? They've got them everywhere. Are they not in these 24 specialty pharmacies? They are. They're both participating in the network. This relates to specialty pharmacy products. It's not the – You all are talking about specialty pharmacies. That excludes CVS? No, they participate also, but these are – my understanding from the record, these are not, you know, antibiotics you can get at any CVS at every street corner, you know, in the city. They're specialty drugs that are only available potentially. But can you – so CVS and Walgreen aren't in this group of 24? They are, Your Honor. They are in this group of 24. Correct. Yes. They've got drugstores everywhere. They do. They do. So each of the things that they're complaining about are plainly disclosed in one of three documents that they were either given or told to look at, the NPA, the addendum to the NPA, or the website. The website also expressly says that pharmacies who are applying must submit a separate application, quote, for each site, unquote. That's page 550 of the joint appendix. Counsel said, well, we had a permit for our Texas location. We thought we didn't need one. Well, you know, the website said you need one for each site.  And they needed a separate application for that, and the website specifically said that. And the record is undisputed that they didn't even bother to read the website until October, months and months later. And you can't support a fraud claim if there's information that's available to you that you just didn't bother to read. They didn't have to dig for this. They were specifically told to go look at this information. You're saying they acted negligently? I think what North Carolina law says, in order to have a fraud claim, you must reasonably investigate, conduct a reasonable investigation. And if they're told, look at this website, it has more information, and it's incorporated in the contract, and you don't do that, that's not reasonable and you can't base a fraud claim. I'd also note, I think in relation to Judge Hyten's questions, the district court dismissed part of their fraud claim on the motion to dismiss. She dismissed omission, expressly said, I'm dismissing the fraud claim to the extent you're alleging an omission for precisely the reasons that Your Honor mentioned, which is, she said, the district court said, you didn't identify a duty to disclose any information. I don't read their brief as appealing that. They appealed summary judgment. I don't think they're appealing the motion to dismiss. So the only thing that's before you with respect to the fraud claim is express misstatements. You mean they had to file a separate notice of heap? No, no. They had to brief it. They could appeal whatever they lost. Their notice of appeal brought the issue here. I think they waived it by not briefing it. They haven't briefed it. They haven't briefed it. I do want to discuss briefly our argument that subsection C does not apply. As I said at the outset, the court doesn't have to reach that if you agree with us that there's no fact dispute on the meaning or application of subsection C, I should say, if there's no fact dispute about it. But to the extent the court thinks that anything survives the district court's opinion on that, C plainly doesn't apply. Subsection C applies. Do you agree that if we could avoid ruling on state law issues, to the extent we could avoid ruling on state law issues, we ought not to? Because we're not a state court. I think that's what I would expect you to do, Your Honor. The usual practice, I would think, would be to And if we can avoid ruling on federal constitutional issues, like Article III, we wouldn't want to get into that either. I agree with you. And if you agree with us that there's no fact dispute and that the district court correctly dismissed it. You ought to stay out of state law issues and constitutional issues, except as a last resort in a case like this. Right. I agree with you. You only have to address whether C applies if you agree with them that any of their claims on the pharmacy of choice statute survive. I do want to correct one statement about that, which is we did argue before the district court at summary judgment that subsection C did not apply. Earlier in the case at the injunction stage, we didn't dispute that C applied. We said, listen, they can't prove a violation of C, so they're not entitled to an injunction. And the district court agreed with us and denied both a TRO and a preliminary injunction. But at summary judgment, we expressly argued the argument we're advancing here that subsection C does not apply. Judge Eagles, in her opinion, addressed that on the merits, did not find any sort of waiver. So our argument that subsection C does not apply is properly before the court. Is that your argument, C doesn't apply because you say E does? Correct. Well, I don't think there's any dispute. I mean, I think everybody would agree that E applies. They didn't sue alleging a violation of E. They sued alleging a violation of C only. C refers to and governs, quote, the terms of a health benefit plan. A health benefit plan is a defined term in North Carolina law. General's. It's not a health care plan. This is the NPA is not a health care plan. A health care plan is defined in Section 5850.110, subsection 11, as being the contract between the insurance company and the member. It's a multiple. It's a long definition, but that's sort of a boiling it down. And the plan is not, excuse me, and the NPA is not part of the plan. But I mean, the whole idea, your whole relationship with your customers pervasively relies on this notion of a network, right? That is a pervasive part of your relationship with your customers. You want them to be able to get service in network. I think you said something like that earlier, right? Generally speaking, that's correct. It depends on the plan because there's some plans that don't have a network. But generally. Okay. So then I think that seems right. But what concerns me then, and maybe this is a reason to not reach the C issue, as Judge King indicated, because this suggests to me that you can deny a pharmacy the opportunity to participate so long as you do it in a document that is separate from your contract with your supplier, right? That seems like a, I mean, I understand you have a textual argument. It may be right. It may be wrong. The North Carolina courts may agree. But it does seem a little odd to say that you've basically set up a network for your customers. North Carolina says, well, we don't want you to be preventing your customers from having opportunities to go to certain pharmacies. And then Blue Cross, if it wants to, under your interpretation of C, can limit the number of options people go to as long as they do it in a document that regulates their relationship with the dispensary, not a document that regulates their relationship with it. I mean, again, this may be an argument why we don't reach this issue at all. But it strikes me as an odd implication of your position, given what it seems to be the overarching purpose of this North Carolina law is. Well, Your Honor, there are several responses to that. Number one, subsection E still applies. There's no dispute. But this opportunity language isn't in E, right? That is true. And what the, you know, this Court's task, any Court's task, is to apply the plain language of the statute. Well, no. Our task is to apply a North Carolina law in the way that a North Carolina court would apply it. That is true. And a North Carolina law, North Carolina court applies the plain language of the statute. I don't read their method of statutory interpretation any different than this Court's method of statutory interpretation, which is that the language of the statute is plain. That's what you apply. Didn't the Senate here make the argument that the North Carolina Bureau of Insurance has opined that networks such as this do fall within subsection C? They have made that argument. If you actually look at what the North Carolina Bureau of Insurance said, first of all, it's extremely short. It has no legal reasoning or explanation. And what it says is, it says the same thing the statute does in C. It says plans. Plans must allow any pharmacy. Plans may maintain multiple versions. So it focuses, as subsection C does, on plans. So we don't think that that is, that advances the ball for them at all. But, again, the question isn't whether we think it advances the ball. The question is whether a North Carolina court would, I mean, I have no idea what North Carolina's version of the Chevron doctrine is, what agencies they defer to, how much they defer to them. I understand, Your Honor. I think, you know, all those are good reasons why, you know, the Court should affirm on, you know, the core summary judgment holding of the district court, which is that there's no fact dispute here. You know, and we do. What is the North Carolina Bureau of Insurance? I'm sorry, Your Honor? What is the North Carolina Bureau of Insurance? It's a regulatory agency. Like the commission of it? Yes. I come from West Virginia. We had an insurance commissioner for an insurance commission. Would that be the same thing, or equivalent sort of? Yes. Yes, Your Honor. The opinion that they rely on was issued by the deputy commissioner of the. . . Deputy commissioner. Yes. So wasn't he by the head fellow? No. I assume he was authorized to do so, but I don't know. So, you know, basically I have not. . . Unless the Court has any further questions, I'll sit down. Thank you very much, sir. Thank you. We appreciate it. Mr. Pearson. Thank you, Your Honor. Briefly, I would like to just touch on. . . How do you get around this subsection here? The reason that. . . I'm sorry. The reason that subsection C applies? Subsection E applies. Subsection C doesn't. The district court erred, but they win anyway. Okay, so. . . That's what they say, I think. Correct, Your Honor. So we believe the district court correctly ruled on that issue. I will just correct opposing counsel. We have broadly brought a claim under the entire statute of the pharmacy of choice statute. Obviously, there are multiple subsections that apply here. So we've never said that subsection E is not relevant to our claims. As I just said to Your Honor, subsection E, which specifically. . . Have you ever argued here or in the district court that subsection E entitles you to relief and why? No, Your Honor. I reference subsection C only because. . . Not that that's a specific term that was violated or a specific provision that was violated, but it gives understanding, as the district court said, that it gives. . . When you're reading the entire statute as a whole, it helps interpret subsection C. And so, as Your Honor's pointed out, if they're able to. . . Number one, they're only able to prevail if they're able to show that there is no other alternative reading of the statute's language other than that subsection C does not apply. The statute or the North Carolina Department of Insurance has already determined that it does apply. And so for this court to predict that a North Carolina. . . So we're supposed to defer to the North Carolina Department of Insurance? Yes, Your Honor. What authority do I have for the proposition that North Carolina courts defer to the North Carolina Commissioner of Insurance? Again, this goes back. . . This is just the flip side of my question to your colleague. I do not know how the Chevron doctrine or some other doctrine like that works in North Carolina. Correct, Your Honor. In our reply brief, I apologize. I don't have it handy. We do cite a case that specifically notes the deference that North Carolina courts give to interpretations of. . . Well, I'm not surprised that they give some deference, but is it Chevron? Is it stronger than Chevron? Is it weaker than Chevron? Yes, Your Honor. The specific language is that they only overrule an agency interpretation, particularly in insurance. . . or in an area of heavily regulated industry like insurance. They'll only overrule that if it's clearly erroneous. And so they say. . . Do I have authority to issue the decree? Yes, Your Honor. Under North Carolina law? This is not just a letter from the deputy commissioner. This was a published bulletin from the department. So although it may have been the deputy commissioner that signed it, it was an official bulletin. The public said the deputy commissioner signed it. It wasn't signed by the commissioner. So it appears written by the deputy commissioner, but it's published as a bulletin from the department. Does the deputy commissioner, that person, he or she, have authority to render the decision on behalf of the. . . We don't know. We're not North Carolina judges. Correct, Your Honor. How do we know all this? I will say again. . . Because it's a federal court. Even if you were. . . It's what they're supposed to decide in North Carolina law. Well, there isn't any. Even if you were putting the agency interpretation aside. . . We have no trouble with federal law. That's my reaction. As do I, Your Honor. But, again, there's no dispute that the statute's purpose is to have it apply in situations like this. So it would be the same standard. The only way that you can ignore the statute's purpose and clear intent and to find that it doesn't apply would be to hold that there's no other way to interpret the statute, which, as the district court correctly held, there is and that it does apply. I'd just like to briefly go back. This case really revolves on the fact issues that are at stake with what Sendera understood and whether they should have reasonably understood the requirements that were required by Blue Cross and whether Blue Cross gave Sendera the same opportunity to participate in the network that they did to other opportunities. What's the relief you want? The relief we want is to reverse the grant of summary judgment and send this case back to the district court. Or do you mean the ultimate? For what? A trial by a jury? Yes, Your Honor, for a trial by jury. To seek damages? Correct, Your Honor. Do you claim you're entitled to multimillion dollars in damages? Well, we have a damages report that said that the harm to us just from that eight-month window was over a million dollars. So we have a damages report that gets into that. Over a million. I thought it was several million. It's not. But that's the reason that this is such an important case for us, Your Honor. It's not exclusively a money issue. It is the interpretation and application of this statute. If the district court's ruling is allowed to stand, it allows plans like Blue Cross to selectively apply their terms and then come back and later after the fact set up these tier of requirements and what's really important and what was a precursor and what wasn't, even though there's nothing in the plan itself to support that. I realize I'm out of time. If I may just wrap up, Your Honors. Go ahead. There are several instances in the record. Again, Blue Cross's own witnesses controverted what they said now, that the terms in state dispensing requirement were not plainly understood. They were not explained. That's why they excused Ovita and Longs from that same requirement because they felt that their discretion, they wanted to allow them to forgive that misunderstanding but not forgive us. And those are fact issues. There's no further questions. Thank you, Your Honors. Thank you. We're pleased to have you here. And if we could do so, we'd come down and shake hands with you and tell you personally that you've done a good job. That's the tradition of the Fourth Circuit. Our friend from Texas might know that or might not know that. We do that regularly until this pandemic came along and now we don't do it anymore. But we hope to get back to it. So the next time you get here, we'll do that. And at this point, we're going to take this case under advisement.
judges: Robert B. King, G. Steven Agee, Toby J. Heytens